UNITED STATES of America

v.

FORD MOTOR COMPANY, Appellant (Two cases).

The UNITED STATES of America, Appellant,

v.

FORD MOTOR COMPANY, a corporation.

Nos. 76–2062, 76–2063 and 77–1378.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 21, 1977.

Decided Jan. 6, 1978.

Abe Krash, Washington, D. C., with whom Melvin Spaeth, Leonard H. Becker, Leonard B. Simon and Paul W. Sweeney, Jr., Washington, D. C., were on the brief, for Ford Motor Co.

Neil H. Koslowe, Atty., Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Leonard Schaitman, Atty., Dept. of Justice, and Earl J. Silbert, U. S. Atty., Washington, D. C., were on the brief, for United States.

William Kanter, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for United States.

Before MacKINNON and ROBB, Circuit Judges, and HOWARD T. MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.

Opinion for the court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

These consolidated cases involve defects in automobiles manufactured by Ford Motor Company. The applicable statute is the National Traffic and Motor Vehicle Safety Act of 1966, as amended (15 U.S.C. §§ 1381 et seq. (Supp. V 1975)) (hereafter the "Act" or "Safety Act"). Nos. 76–2062 and 76–

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

2063 concern Ford's appeal from the district court's entry of summary judgment in part for the Government, and its order that Ford recall approximately 500,000 1968 and 1969 model-year Mustang and Cougar automobiles and replace a defective seat-pin bracket in the driver's seat of each of these cars.[1] This bracket connects the back of the seat to the bottom of the seat as shown in the sketch reproduced below from the Government's brief, page 5a.[2] No. 77–1378 concerns the Government's appeal from the district court's approval of a final recall notice which the Government believes does not comply with the relevant statutory and regulatory standards.[3]

## I. BACKGROUND

After a lengthy investigation, the Administrator of the National Highway Traffic Safety Administration ("NHTSA") on August 12, 1975 [4] ordered Ford to notify the owners of 1968 and 1969 model-year Mustang and Cougar automobiles that the cars contained a defect related to motor vehicle safety and to remedy the defects in such vehicles as required by the Act.[5] Ford de-

---

1. The district court's memorandum opinion and grant of summary judgment was filed on October 1, 1976 (J.A. 340–50); the judgment was entered by order on October 20, 1976 (J.A. 351–52). The October 20 order is the subject of the appeal in No. 76–2062 (see J.A. 389–90). Ford filed a motion for reconsideration of the October 20 order on or about November 1, 1976 (J.A. 353–54). This motion was denied on November 16, 1976 (J.A. 388). The denial of the motion for reconsideration is the basis of the appeal in No. 76–2063 (see J.A. 391–92).

2. PIVOT CONNECTION AREA DETAIL BLOW UP SHOWING .. "HOCKEY STICK" AND BRACKET

"HOCKEY STICK"

BRACKET

Govt. Br. at 5a.

3. The district court order was filed April 14, 1977, and appears in the addendum to the Government's Brief at 64a. See note 8 infra.

4. The facts of this case date back to September, 1969, when the National Highway Traffic Safety Administration ("NHTSA") received two consumer letters complaining about the collapse of seat backs in vehicles with this type of seat bracket pin (J.A. 25). The agency conducted an investigation which proceeded with varying degrees of intensity over the next six years (see generally J.A. 29–150). On March 13, 1975, NHTSA advised Ford that it had "initially determined" on the basis of its investigation that the 1968 and 1969 model-year Mustangs and Cougars contained a safety-related defect (J.A. 69–168). Ford was given an opportunity to submit data, views, and arguments, and Ford made an oral presentation (see J.A. 170). Thereafter, on August 12, 1975, NHTSA directed Ford to provide the statutorily required notice to the owners of the affected vehicles and to remedy the defect in them as required by the Act (J.A. 170–71).

5. The Act defines "motor vehicle safety" as

The performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accidents occurring as a result of the design, construction or performance of motor vehicles and is also protected against unreasonable risk of death or injury to persons in the event accidents do occur, and includes nonoperational safety of such vehicles.

15 U.S.C. § 1391(1) (1970). The procedures to be followed if the Secretary finds a defect are specified in 15 U.S.C. § 1412 (Supp. V 1975):

(a) If through testing, inspection, investigation, or research carried out pursuant to this chapter, or examination of communications under section 1418(a)(1) of this title, or otherwise, the Secretary determines that any motor vehicle or item of replacement equipment—

\* \* \* \* \* \*

(2) contains a defect which relates to motor vehicle safety; he shall immediately notify the manufacturer of such motor vehicle or item of replacement equipment of such determination, and shall publish notice of such determination in the Federal Register. The notification to the manufacturer shall include all information upon which the determination of the Secretary is based. Such notification (including such information) shall be available to any interested person, subject to sec-

clined to comply with this order and indicated its intention to seek judicial review (J.A. 172). Thus, on August 18, 1975, the Government filed suit to enforce the Administrator's order of August 12, 1975 (J.A. 151–55).[6] After Ford answered the complaint (J.A. 156–61) and after both parties undertook extensive discovery, the Government filed a motion for summary judgment (J.A. 284 *et seq.*). The district court filed its opinion granting in part the Government's motion on October 1, 1976 (J.A. 340–50).[7] Judgment in accordance with the opinion was entered on October 20, 1976 (J.A. 351–52). Thereafter, Ford appealed the October 20 order in this court.

In the district court, Ford sought a stay of the court's order pending appeal, but this request was denied. Then, on November 24, 1976, Ford sought in this court a stay pending appeal. On that same day, we granted an "administrative stay" pending disposition of Ford's stay request. The stay motion was denied on January 19, 1977, but we extended the administrative stay for two weeks to allow the parties to make further efforts to reach agreement on the terms of an "interim" recall notice. It was contemplated that the "interim" notice would be issued prior to our consideration of the appeal from the district court's summary judgment order. Several weeks passed during which the Government and Ford could not agree on the terms of the interim recall notice; the administrative stay was extended throughout this period. Finally, on March 8, 1977, after considering two proposed interim notices and the objections to each, this court granted Ford a stay pending appeal *provided* that it promptly distribute the Government's interim notice (Addendum to Govt. Br. at 16a). Ford, however, considered this result unacceptable: by letter dated March 21, 1977, Ford advised this court through counsel that

upon the record evidence in this case and the information available to Ford, it is unable to agree that the notice proposed by the Government fairly represents the likely consequences of seat pin breakage. Under the circumstances, Ford's management has decided, for public and customer relations reasons, not to send such a letter but to undertake a final recall of the cars.

*Id.* at 20a–21a.

The Government, concerned that the terms of Ford's unilateral final recall notice would not adequately advise car owners of the safety consequences of the pin defect, filed an emergency motion with this court on March 24, 1977 to prohibit Ford from

tion 1418(a)(2)(B) of this title. The Secretary shall afford such manufacturer an opportunity to present data, views, and arguments to establish that there is no defect or failure to comply or that the alleged defect does not affect motor vehicle safety; and shall afford other interested persons an opportunity to present data, views, and arguments respecting the determination of the Secretary.

(b) If, after such presentations by the manufacturer and interested persons, the Secretary determines that such vehicle or item of replacement equipment does not comply with an applicable Federal motor vehicle safety standard, or contains a defect which relates to motor vehicle safety, the Secretary shall order the manufacturer (1) to furnish notification respecting such vehicle or item of replacement equipment to owners, purchasers, and dealers in accordance with section 1413 of this title, and (2) to remedy such defect or failure to comply in accordance with section 1414 of this title. (Emphasis added).

The text of § 1413 appears at note 15 *infra*; the text of § 1414 appears at note 16 *infra*.

6. On August 18, 1975, Ford filed a suit challenging the constitutionality of various provisions of the Act, including the penalty provisions of the Act for noncompliance with an NHTSA order. A three-judge district court rejected Ford's constitutional challenge and the Supreme Court summarily affirmed. *Ford Motor Co. v. Coleman*, 402 F.Supp. 475 (D.D.C. 1975), *aff'd*, 425 U.S. 927, 96 S.Ct. 1656, 48 L.Ed.2d 170 (1976). The three-judge court, however, granted Ford a temporary stay pending Ford's application for a statutory stay of the penalty provisions in the Government's enforcement action, which, as mentioned in the text, was also filed on August 18, 1975 (402 F.Supp. at 490–91). Ford sought and was granted a statutory stay of the penalty provisions by the district court in this action (J.A. 211–13).

7. The "Memorandum Opinion and Grant of Summary Judgment" is reported at 421 F.Supp. 1239.

implementing any final recall (*Id.* at 22a–23a). The motion was granted on March 25, 1977 (*Id.* at 27a), and the parties subsequently filed proposed final recall notices. On April 8, 1977, this court remanded the case to the district court to determine whether Ford's proposed final notice satisfied the judgment of the district court (Appendix to Govt. Br. at 36a). On April 14, 1977, the district court, after conducting a hearing, approved Ford's recall notice with certain modifications and directed Ford to distribute it (*Id.* at 64a; Appendix to Ford Brief at 71a).[8]

The Government did not seek a stay of the district court's April 14, 1977 order, but instead appealed it in No. 77–1378. The Government urges that a second recall notice be issued with language that, in the Government's view, corrects inadequate language contained in the order approved by the district court.

## II. FORD'S APPEAL FROM THE SUMMARY JUDGMENT

■ The purpose of the Safety Act is to protect the public against the unreasonable risk of accidents which might be caused by defects in the design, construction, or performance of motor vehicles and against the unreasonable risk of death or injury in the event of such accidents.[9] The Act contains a variety of mechanisms designed to further this purpose, but the one that concerns us here is the Act's requirement that manufacturers notify purchasers of motor vehicles containing a safety-related defect that poses an unreasonable risk of accident or injury within the meaning of the statute (15 U.S.C. § 1391; 15 U.S.C. § 1412).[10] As mentioned above, the district court decided that the seat-pin bracket in the cars in question constituted a safety-related defect which posed an unreasonable risk within the meaning of the Act. Accordingly, the district court, upon the Government's summary judgment motion, ordered Ford to recall the cars and repair the defective parts.

■ Ford appealed this decision, but thereafter unilaterally instituted a final recall to repair the defective seat pins in the vehicles. Ford has, on its own, initiated action which, *if completed in accordance with the requirements of the applicable statutes and regulations*, will result in the elimination of the dangerous condition that was the subject of the proceedings before the district court. Now that Ford has decided to repair the defects, the question on appeal—whether the district court erred when it declared the defect an unreasonable risk and ordered a recall upon the Government's summary judgment motion—is moot. By eliminating the defect in these vehicles, Ford will eliminate the very subject of the suit in Nos. 76–2062 and 76–2063. A federal court should not consider questions or decide issues that do not involve actual controversies affecting the rights of some litigant in the case before it.[11] Since a recall is under way and since the defects are being repaired, we need not

---

**8.** The Government's proposed final recall notice appears in the appendix to the Government Brief at 39a. Ford's proposed final recall notice appears in same at 44a. The notice approved by the court is attached to the order, which appears in same at 64a.

**9.** This purpose cannot be made more clear than the express language of Congress: "Congress hereby declares that the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381 (1970). This purpose also draws support from 15 U.S.C. § 1391(1) (Supp. V 1975), which is reprinted at note 5 *supra.* Judicial recognition of this purpose is manifest. *E. g., Chrysler Corp. v. Tofany,* 419 F.2d 499, 508 (2d Cir. 1969); *Boating Industry Assn. v. Boyd,* 409 F.2d 408, 410 (7th Cir.

1969); *Larsen v. General Motors Corp.,* 391 F.2d 495, 506 (8th Cir. 1968). *See also United States v. General Motors Corp.,* 171 U.S.App. D.C. 27, 47, 518 F.2d 420, 440 (1975).

**10.** *See* note 5 *supra.*

**11.** *St. Pierre v. United States,* 319 U.S. 41, 42, 63 S.Ct. 910, 87 L.Ed. 1199 (1943); *International Union, United Mine Workers of America v. NLRB,* 152 U.S.App.D.C. 82, 83–4, 468 F.2d 1139, 1140–41 (1972). *See Alton & Southern Ry. Co. v. Int. Assn. of Machinists & Aerospace Workers,* 150 U.S.App.D.C. 36, 41, 463 F.2d 872, 877 (1972).

The instant case is similar in some respects to *Brownlow v. Schwartz,* 261 U.S. 216, 43 S.Ct. 263, 67 L.Ed. 620 (1923). In *Brownlow,*

decide whether the district court's entry of summary judgment was proper. We hold that the dispute in Nos. 76–2062 and 76–2063 is moot. Accordingly, we dismiss the appeals in these two cases.

## III. THE ADEQUACY OF THE RECALL NOTICE

In No. 77–1378, the Government appeals the district court's order of April 14, 1977 approving Ford's final recall notice.[12] At the outset, Ford asks us to hold that if a manufacturer sends a final recall notice pursuant to court order, the manufacturer has discharged its responsibilities under the Act, and it cannot be required to send a second, corrective notice; thus, Ford insists that the Government should be allowed to appeal district court orders approving allegedly inadequate recall notices only if it first sought a stay of the order before initiating the appeal. To state the proposition otherwise, Ford would have us hold that a manufacturer who circulates pursuant to a judicial mandate a recall notice which does not comply with the statute cannot be required to circulate a second notice which does satisfy the statute *if* the Government did not seek a stay of the district court order prior to appeal.

petitioner sought review of a judgment of this court that directed the issuance of a writ of mandamus to compel the granting of a building permit. After the decision of this court, the permit was issued, the building was erected, and the property was transferred to persons not parties to the case. The Court concluded: "[i]t thus appears that there is now no actual controversy between the parties—no issue on the merits which this Court can properly decide." 261 U.S. 217, 43 S.Ct. 264. This conclusion was based on two independent grounds: the second was that the property had been transferred, but the first was that "the permit, the issuance of which constituted the sole relief sought by petitioner, has been issued and the building to which it related has been completed." *Id.* The Court stated: "This Court will not proceed to a determination when its judgment would be wholly ineffectual for want of a subject matter on which it could operate. . . To adjudicate a cause which no longer exists is a proceeding which the Court uniformly has declined to entertain." 261 U.S. at 217–18, 43 S.Ct. at 264. In the Ford defect proceedings, the district court gave summary judgment in part for the Government in its action to enforce the order of the Administrator that Ford recall the cars and remedy the defect. Prior to appeal, Ford "acceded" to the Administrator's order (*see* note 12 *infra*) although a dispute remains whether Ford's purported compliance is legally sufficient. This latter dispute is the product of a separate, distinct district court order approving Ford's recall notice. Now that the *core* of the Administrator's order has been complied with, no actual controversy—as was the situation in *Brownlow*—remains in this part of the case.

Consider also *Gray v. Board of Trustees of the University of Tennessee*, 342 U.S. 517, 72 S.Ct. 432, 96 L.Ed. 540 (1952), where appellants sought to enjoin the appellees from refusing to admit Blacks to the University. At oral argument, counsel for appellees stated that appellants would be admitted to the University as requested. Upon that representation and upon the absence of any suggestion that any person "similarly situated" would not be afforded similar treatment, the Court declared the controversy moot and remanded the case so that the action could be dismissed. 342 U.S. at 518, 72 S.Ct. 432. Similarly, in *Board of School Commissioners of Indianapolis v. Jacobs*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975), the Court held that a purported class action by six named plaintiffs challenging certain school regulations was moot where all plaintiffs had graduated from school and the class was not properly identified. 420 U.S. at 129–30, 95 S.Ct. 848.

**12.** In deciding No. 77–1378, we assume *arguendo* that the defect in the seat pin bracket is a safety-related defect that poses an unreasonable risk within the meaning of the Act. The district court made this finding on summary judgment; we express no opinion on whether this was proper, as we decline to reach the merits of the district court's grant of summary judgment for the Government in Nos. 76–2062 and 76–2063. Our assumption is perfectly appropriate, since in deciding to issue a final recall of the vehicles with the defective parts, Ford has "acquiesced" in the Administrator's findings that the possibility of failure of the seat-pin is a safety-related defect that constitutes an unreasonable risk. We note, however, that throughout these proceedings Ford has emphatically disputed these findings. Ford argues in its brief in Nos. 76–2062 and 76–2063 that the record does not show a single fatality or serious accident and only shows a few losses of control. Ford also argues that most seat pins that will fail have done so already. *See generally* Ford's Br. (Nos. 76–2062 & 76–2063) at 13–30. Ford, of course, advances these arguments only for the purpose of urging that it is entitled to a trial and that summary judgment was improper. We do not evaluate these arguments, as they have been rendered moot by the decision to recall the automobiles.

Ford's position admittedly has some intuitive attractiveness: at first glance, it appears to draw support from the equitable principle that a party which claims equitable relief (here the Government) must act with reasonable promptness. *See Russell v. Todd,* 309 U.S. 280, 287, 60 S.Ct. 527, 84 L.Ed. 754 (1940); *Parker v. Dacres,* 130 U.S. 43, 50, 9 S.Ct. 433, 32 L.Ed. 848 (1889); *Major v. Shaver,* 88 U.S.App.D.C. 148, 149, 187 F.2d 211, 212 (1951); 2 Pomeroy Equity Jurisprudence § 418 (5th ed. Symons 1941). We decline, however, to accept Ford's position. To do so would ignore the interests sought to be protected by the Act and would not give full recognition to the special factual context presented by this case.

As noted earlier, the purpose of the Act is to protect the *public* against the unreasonable risk of accidents which might result from defects in motor vehicles and from the unreasonable risk of death or injury caused by such accidents. The Act provides that if a defect is discovered by the manufacturer [13] *or* the Secretary,[14] the manufacturer must give notice to the owners of the vehicles and must remedy the defect. Congress itself has designated what information the notice must contain.[15] This statute reflects

---

**13.** 15 U.S.C. § 1411 (Supp. V 1975) provides:
  If a manufacturer—
    (1) obtains knowledge that any motor vehicle or item of replacement equipment manufactured by him contains a defect and determines in good faith that such defect relates to motor vehicle safety;

  \*    \*    \*    \*    \*    \*

  he shall furnish notification to the Secretary and to owners, purchasers, and dealers, in accordance with section 1413 of this title, and he shall remedy the defect or failure to comply in accordance with section 1414 of this title.

**14.** 15 U.S.C. § 1412 (Supp. V 1975). *See* note 5 *supra.*

**15.** 15 U.S.C. § 1413 (Supp. V 1975) provides:
  (a) The notification required by section 1411 or 1412 of this title respecting a defect in or failure to comply of a motor vehicle or item of replacement equipment shall contain, in addition to such other matters as the Secretary may prescribe by regulation—
    (1) a clear description of such defect or failure to comply;
    (2) an evaluation of the risk to motor vehicle safety reasonably related to such defect or failure to comply;
    (3) a statement of the measures to be taken to obtain remedy of such defect or failure to comply;
    (4) a statement that the manufacturer furnishing the notification will cause such defect or failure to comply to be remedied without charge pursuant to section 1414 of this title;
    (5) the earliest date (specified in accordance with the second and third sentences of section 1414(b)(2) of this title) on which such defect or failure to comply will be remedied without charge and, in the case of tires, the period during which such defect or failure to comply will be remedied without charge pursuant to section 1414 of this title; and
    (6) a description of the procedure to be followed by the recipient of the notification in informing the Secretary whenever a manufacturer, distributor, or dealer fails or is unable to remedy without charge such defect or failure to comply.
  (b) The notification required by section 1411 or 1412 of this title shall be furnished—
    (1) within a reasonable time after the manufacturer first makes a determination with respect to a defect or failure to comply under section 1411 of this title; or
    (2) within a reasonable time (prescribed by the Secretary) after the manufacturer's receipt of notice of the Secretary's determination pursuant to section 1412 of this title that there is a defect or failure to comply.
  (c) The notification required by section 1411 or 1412 of this title with respect to a motor vehicle or item of replacement equipment shall be accomplished—
    (1) in the case of a motor vehicle, by first class mail to each person who is registered under State law as the owner of such vehicle and whose name and address is reasonably ascertainable by the manufacturer through State records or other sources available to him;
    (2) in the case of a motor vehicle, or tire, by first class mail to the first purchaser (or if a more recent purchaser is known to the manufacturer, to the most recent purchaser known to the manufacturer) of each such vehicle or tire containing such defect or failure to comply, unless the registered owner (if any) of such vehicle was notified under paragraph (1);
    (3) in the case of an item of replacement equipment (other than a tire), (A) by first class mail to the most recent purchaser known to the manufacturer; and (B) if the Secretary determines that it is necessary in the interest of motor vehicle safety, by public notice in such manner as the Secretary may order after consultation with the manufacturer;
    (4) by certified mail or other more expeditious means to the dealer or dealers of such

**542**

what Congress believes to be the minimum amount of disclosure necessary to fulfill the purposes of the Act.[16] Obviously, approving recall notices that fail to meet the statutory requirements does not further the policies of the Act.

■ Of course, a court of equity is vested with the discretion to prevent undue prejudice that might arise when one party fails to assert its rights and thereby causes detriment to the position of its opponent, but this is not the case here. It was Ford that chose not to comply with this court's interim notice order and decided instead to proceed with a final recall. In doing so, it fully realized—or should have realized—that the Government might challenge the adequacy of the final notice. Ford did not—and indeed cannot—dispute this. Instead, Ford's contention is that once the district court ordered Ford to issue the final recall notice, it was then the obligation of

the Government to seek a stay to preserve its right of appeal. This argument, however, is based upon a basic misapprehension of the course of these proceedings. Throughout this litigation, Ford has pressed for acceptance of its own proposed notice.[17] Likewise, the Government has vigorously opposed Ford's proposed language and has pressed equally hard for the language which it believes satisfies the statutory requirements. Having heard the objections of the Government prior to argument in the district court, Ford was on notice that its recall language might not comply with the statute. Accordingly, Ford should have expected that the Government might appeal an adverse decision of the district court.[18] Ford did not change its position in reliance on the Government's failure to seek a stay. And if Ford seriously thought that having to transmit a second, corrective recall notice would prejudice its interests, *Ford could*

manufacturer to whom such motor vehicle or replacement equipment was delivered; and

(5) by certified mail to the Secretary, if section 1411 of this title applies.

In the case of a tire which contains a defect or failure to comply (or of a motor vehicle on which such tire was installed as original equipment), the manufacturer who is required to provide notification under paragraph (1) or (2) may elect to provide such notification by certified mail.

16. Congress has also specified the means by which a defect shall be remedied. Again, this statute reflects what Congress perceives to be the necessary elements for fulfilling the policies of the Act. 15 U.S.C. § 1414 (Supp. V 1975) provides in part:

(a)(1) If notification is required under section 1411 of this title or by an order under section 1412(b) of this title with respect to any motor vehicle or item of replacement equipment which fails to comply with an applicable Federal motor vehicle safety standard or contains a defect which relates to motor vehicle safety, then the manufacturer of each such motor vehicle or item of replacement equipment presented for remedy pursuant to such notification shall cause such defect or failure to comply in such motor vehicle or such item of replacement equipment to be remedied without charge. In the case of notification required by an order under section 1412(b) of this title, the preceding sentence shall not apply during any period during which enforcement of the order has been restrained in an action to which section 1415(a) of this title applies or

if such order has been set aside in such an action.

(2)(A) In the case of a motor vehicle presented for remedy pursuant to such notification, the manufacturer (subject to subsection (b) of this section) shall cause the vehicle to be remedied by whichever of the following means he elects:

(i) By repairing such vehicle.

(ii) By replacing such motor vehicle without charge, with an identical or reasonably equivalent vehicle.

(iii) By refunding the purchase price of such motor vehicle in full, less a reasonable allowance for depreciation.

Replacement or refund may be subject to such conditions imposed by the manufacturer as the Secretary may permit by regulation.

(B) In the case of an item of replacement equipment the manufacturer shall (at his election) cause either the repair of such item of replacement equipment, or the replacement of such item of replacement equipment without charge with an identical or reasonably equivalent item of replacement equipment.

17. Ford asserts that it did not send the notice on its own free will but did so under court order. This argument ignores the fact that Ford urged the court to accept *its* proposed letter and the court did so with minor modifications.

18. The Government's notice of appeal was timely filed.

have asked the district court for a stay pending appeal.

■ In short, when Ford decided to draft its own final recall notice, Ford prompted the Government's challenge, and Ford resisted that challenge in court. By embarking on this course, Ford took the risk that litigation would ensue and that a court— trial *or* appellate—might find its notice legally insufficient. This is a fair price for Ford's conscious decision not to heed warnings that the notice was inadequate. Indeed, Ford is cognizant of the important policies served by the Safety Act. Ford must have realized that the Government, vested with the responsibility to protect the public interest, might decide that having *an inadequate notice* of the dangerous condition sent immediately was to be preferred over having *no notice* sent during the pendency of an appeal. The interest of the public in this matter is obviously not of small moment. We hold that the Government's appeal of the district court order is properly before this court.

■ Before proceeding to the merits, we posit this observation, which should be apparent from our preceding discussion: this court's deciding of the merits of similarly situated appeals does not place an undue burden on automobile manufacturers. Manufacturers are aware both of what the statute and the regulations require and of what policies the statute is intended to further. The public has a right to expect that automobile manufacturers will live up to their responsibilities under the Act. If a manufacturer chooses to ignore warnings that its notice is not in compliance with the relevant law and it nevertheless insists on sending out language of its own choice, the manufacturer invites litigation. Even if the manufacturer per-

suades a district court that its notice is adequate, the manufacturer assumes the risk that the court's decision might be appealed, that the prior notice might be deemed legally insufficient, and that a corrective notice will be required. The manufacturer has this knowledge prior to its decision on how it will proceed with a recall. The manufacturer knows the rules of the game; it may well come to regret its decision to play the game once the score is final. Yet the manifestation of this result, while unpleasant for the manufacturer which does not ultimately prevail, amounts to far less than the imposition of an undue burden on the manufacturer. It is but a small price for the protection of the public, and it is a price that the manufacturer assumed the risk of one day having to pay.[19]

Since the Government's appeal is properly before the court, we now consider whether the recall notice approved by the district court satisfies the applicable statutory and regulatory requirements. The controlling statute on the adequacy of the notice is 15 U.S.C. § 1413 (Supp. V 1975).[20] This statute requires that the notice contain several specific items, and it also requires "such other matters as the Secretary may prescribe by regulation." Acting under this authority, the Secretary has prescribed regulations which provide additional standards for a valid notice.[21]

■ The Government challenges the adequacy of the final recall notice approved by the district court on two grounds. First, it argues that the notice does not contain a clear description of the defect. In pertinent part, the approved notice states:

The defect involves the driver's seat back inboard pivot pin bracket, which could break without prior warning allowing the seat back to rotate rearward. The Na-

19. *See Ford Motor Co. v. Coleman,* 402 F.Supp. 475, 489 (D.D.C.1975) (three-judge court, per Leventhal, J.), *aff'd,* 425 U.S. 927, 96 S.Ct. 1656, 48 L.Ed.2d 170 (1976).

20. *See* note 15 *supra.*

21. 49 C.F.R. Part 577 (1976). The purpose of the regulations is described at 49 C.F.R. § 577.3 (1976):

The purpose of this part is to insure that defect notifications provide adequate information to recipients, and effectively motivate owners of potentially defective or noncomplying motor vehicles or items of motor vehicle equipment to have vehicles and equipment inspected and where necessary, repaired as quickly as possible.

tional Highway Traffic Safety Administration has further concluded that the pivot pin bracket could break while persons are getting into or out of the vehicle or in any driving mode and may cause the driver to fall backward.

Appendix to Govt. Br. at 65a. The statute requires that the notice contain "a clear description of such defect" (15 U.S.C. § 1413(a)(1) (Supp. V 1975)). Regulations enacted pursuant to the statute require the notice to contain[22]

[a] clear description of the defect, which must include—

(1) Identification of the vehicle system or particular item or items of motor vehicle equipment affected;

(2) A description of the malfunction that may occur;

(3) A statement of operating or other conditions that may cause the malfunction to occur; and

(4) Precautions, if any, that the purchaser should take to reduce the chance that the malfunction will occur before the vehicle is repaired.[23]

49 C.F.R. § 577.4(c) (1976). It is our opinion that the description approved by the district court clearly and accurately describes the defect in terms that a reasonable person would understand. The notice identifies the defect, describes the nature of the malfunction, and states the conditions under which the failure might occur. The description fulfills both the requirements and the purpose of the statute and the relevant regulations.[24]

As a second ground, the Government contends that the description contains an inadequate "evaluation of the risk to motor vehicle safety." In pertinent part, the approved notice states:

The safety risk that may result from this defect is loss of vehicle control without warning, which can cause, and has caused, accidents in the past.

Appendix to Govt. Br. at 65a. The statute requires that the notice contain an "evaluation of the risk to motor vehicle safety reasonably related to such defect" (15 U.S.C. § 1413(a)(2) (Supp. V 1975)). The

---

**22.** Deleted from this excerpt from the regulations and from those excerpts which follow is this language:

> Whenever a manufacturer of motor vehicles or tires determines that a defect potentially existing in any motor vehicle or item of motor vehicle equipment he produces relates to motor vehicle safety, he shall notify by certified mail the first purchaser (where known) of such vehicle or item of motor vehicle equipment, and any subsequent purchaser to whom a warranty on such vehicle or item of equipment has been transferred. The notification shall contain the following information. In the case of paragraphs (a) and (b) of this section, the information shall be presented in the form and in the order specified. The information required in paragraphs (c), (d), and (e) of this section may be presented in any order. Whenever the address of the purchaser is in either the Commonwealth of Puerto Rico or the Canal Zone, the notification shall be sent in both the English and Spanish languages.
> [subsections (a)–(e) deleted]

49 C.F.R. § 577.4 (1976).

**23.** A subsequent part of the recall notice contains the following statement: "As a precautionary measure, you may wish to place a large firm object behind the driver's seat back until the bracket has been replaced." (Appendix to

Govt. Br. at 66a.) The adequacy of this statement is not disputed.

**24.** The Government proposed the following description of the defect:

> 1. *The defect.* The defect is located in a metal bracket on the right-hand side of the driver's seat, which connects the back of the seat to the bottom of the seat. This bracket is technically called the driver's bucket seat back inboard pivot pin bracket. One part of this bracket, called the "pin", breaks suddenly and without any warning. This causes the seat back to snap off from the seat bottom on the right side, and to swing backward and downward in a clockwise motion. The bracket pin may break at any time, and either while the automobile is standing still or while the automobiles is moving at low, medium, or high speeds.

Appendix to Govt. Br. at 39a. This description also meets the requirements of the statute and the relevant regulations. In some respects, the Government's proposal might be considered clearer than that finally approved by the district court, but we note that it is longer, which could discourage some individuals from reading it carefully. These considerations are the proper subject of the trial court's discretion. We cannot say that the approved description of the defect is legally insufficient.

applicable regulation states that the notice must contain

[an] evaluation of the risk to traffic safety reasonably related to the defect.

(1) When vehicle crash is the potential occurrence, the evaluation must include whichever of the following statements is appropriate:

(i) That the defect can cause vehicle crash without prior warning, or

(ii) A description of whatever warning may occur, and a statement that if this warning is not heeded, vehicle crash can occur.

49 C.F.R. § 557.4(d) (1976). The Government attacks this portion of the approved notice in two ways. First, it contends that the notice contains no description of the specific safety consequences of the failure of the defect. We disagree. The notice states in clear and unambiguous terms that an accident might result. In this context, "accident" and "vehicle crash" are synonymous. The specific safety consequences are adequately described. Second, the Government contends that the notice is inadequate because it does not contain the following words: "the defect can cause vehicle crash without prior warning." The Government believes that those nine words convey a stronger message of danger than the language approved by the district court. We note at the outset that the regulation does not *require* that the nine words appear in the notice exactly as they appear in the regulation. Section 557.4(d) is unlike other parts of the regulations, such as section 557.4(a) [25] or section 557.4(b)(1) [26] which do require specific words to be placed in the notice. Section 557.4(d) only requires a statement that *communicates* the idea that a vehicle crash can occur without prior warning.[27] The language in the approved notice is wholly adequate to communicate to the car owner the danger of seat-pin failure "without prior warning."

With respect to the description of the risk to motor vehicle safety, the Government also argues that this court, by virtue of its March 8, 1977 order concerning an interim recall notice, held that nothing less than the Government's description met the minimum requirements for a recall notice,[28] and that this holding is the law of the case to which the district court was bound on remand (Govt. Br. at 19). We disagree. This court's April 8, 1977 order instructed the district court to determine whether Ford's proposed final recall notice satisfied the court's judgment and otherwise met the minimum statutory and regulatory requirements. On remand, the district court was

---

**25.** 49 C.F.R. § 557.4(a) provides:
[The notification shall contain an] opening statement: "This notice is sent to you in accordance with the requirements of the National Traffic and Motor Vehicle Safety Act."

**26.** 49 C.F.R. § 557.4(b)(1) provides:
(b)(1) The statement: "(Manufacturer's name or division) has determined that a defect which relates to motor vehicle safety exists in (identified motor vehicles, in the case of notification sent by a motor vehicle Manufacturer; identified motor vehicle equipment, in the case of notification sent by a motor vehicle equipment manufacturer)."

**27.** We note that the recall letter actually proposed by Ford contained the following sentence: "If breakage were to occur while driving, the driver could lose control of the vehicle which could result in a vehicle crash." The district court objected to this sentence and substituted the following: "The safety risk that may result from this defect is loss of vehicle control without warning which can cause and has caused accidents in the past." Appendix to Govt. Br. at 60a–61a. The district court

apparently felt that the reference to accidents—even though there was no mention of "crash"—would better motivate owners to have the defects repaired. We conclude that the court's change at least does not reduce the effectiveness of the message and that the approved language satisfies the statutory and regulatory requirements.

**28.** The Government contends that, at a minimum, the recall notice must contain the following:
Consequences of seat collapse include the following: the occupant may fall rearward; the driver may lose control of the vehicle for a period of some seconds; he may lose contact with the brake and accelerator or experience impaired ability to brake; he may lose contact with the steering wheel or experience impaired ability to steer; his vision of the road may be lost; his vehicle may swerve from the proper path, in some cases, into opposing lanes of traffic or off the roadway. Addendum to Govt. Br. at 17a–18a.

not bound to accept any previously proposed notice as the minimum standard for a valid final recall notice.

The recall notice approved by the district court fulfills the requirements of the statute and the regulations. The Government's objections are without merit. For these reasons, the April 14, 1977 judgment of the district court approving the final recall notice is affirmed.

## IV. SUMMARY

We express no opinion on the propriety of the district court's entry of summary judgment for the Government in Nos. 76–2062 and 76–2063, since we hold that the appeals in such cases are moot. However, since the appeals in those two cases are dismissed, the judgments entered by the district court remain final and valid. In No. 77–1378, we hold that the Government's suit is not barred, that it is properly before this court, and that the recall notice approved by the district court satisfies the relevant statutory and regulatory standards; hence, we affirm the April 14, 1977 judgment of the district court approving the recall notice distributed by Ford.

*Judgment accordingly.*